[No. 25332-1-II. Division Two. July 27, 2001.]

JENNIFER WOOD, *Respondent*, v. BATTLE GROUND SCHOOL DISTRICT, ET AL., *Appellants*.

---

552

554

*Mark S. Northcraft* and *Dennis G. Woods* (of *Northcraft & Woods, P.C.*), for appellants.

*Bruce R. Colven* (of *Morse & Bratt*), for respondent.

SEINFELD, J. — This case involves the scope of the Open Public Meetings Act of 1971 (OPMA). We hold that the OPMA does not cover persons elected but not yet sworn into

public office, but that under some circumstances electronic mail communications can constitute a "meeting." Regarding the cross-appeal of a summary judgment dismissal of Jennifer Wood's defamation claim, we hold that the school board president has a qualified privilege but does not have absolute immunity. Consequently, we reverse the summary judgment on both claims and remand for trial.

## FACTS

In November 1997, Roger Sharp, Fred Striker, and David Sonntag were elected to the Battle Ground School Board (Board) and they took the oath of office on November 26, 1997. They joined continuing members Sam Kim and Pat Cherry. Dr. Leo Beck was the Battle Ground School District (District) superintendent at the time, a position he held until December 9, 1997.

Wood worked for the District since 1989. In 1991 she began working for superintendent Beck; in 1994 she became an administrative assistant; and in 1996 she also took on the responsibilities of the District's communications coordinator with a corresponding pay raise.

On November 15, 1997, members-elect Sharp, Striker, and Sonntag met with Board member Kim at Sonntag's house where they discussed, among other matters, Beck and Wood. There were rumors that Sharp had a "hit list" of District employees that he wanted to terminate because he felt they were overpaid, under-performing, and otherwise unqualified; that list included Beck and Wood. Sharp, Striker, Sonntag, and Kim also exchanged electronic mail (e-mail) messages about Board business before and after the three members-elect took the oath of office.

At the newly constituted Board's first meeting on November 26, 1997, the members elected Sharp as Board president. The Board later discussed Beck and Wood in an executive session.

After Beck resigned under an agreement with the District, rotating interim superintendents served for the 1997-

1998 academic year. Although each of the interim superintendents stated that Wood's performance had been competent to excellent, Sharp discussed with them the possibility of removing her from the District. In an effort to retain Wood, on January 5, 1998, an interim superintendent reassigned her to the position of print shop supervisor.

On January 28, 1998, the local newspaper, *The Reflector*, printed an article attributing to Sharp a statement that Wood's performance as communications coordinator was "lacking." Sharp's statement was in response to a *Reflector* reporter's inquiry about Wood's performance or about why the District was not renewing her contract. Wood's contract with the District expired in August 1998 and her employee file reflects that she was terminated.

Wood then sued the District, the Board, Sharp, Kim, and Striker for violations of the public disclosure act and the OPMA and she sued Sharp for defamation. Following cross motions for summary judgment, the trial court granted summary judgment to Wood on her OPMA claim and granted summary judgment to the defendants on Wood's defamation claim. The court imposed a $200 statutory penalty against each individual defendant for two OPMA violations and awarded Wood her attorney fees.

Wood moved for reconsideration on her defamation claim and the defendants responded with a CR 11 motion for sanctions, asserting that Wood's motion merely reiterated the facts and argument she had previously presented to the trial court. The court denied both motions.

## ANALYSIS

In reviewing a summary judgment decision, we engage in the same inquiry as the trial court. *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 169, 736 P.2d 249 (1987). Thus, summary judgment is appropriate if the evidence, viewed in the nonmoving party's favor, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Wilson v.*

*Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). We will grant the motion only if reasonable persons could reach but one conclusion. *Wilson*, 98 Wn.2d at 437.

## OPEN PUBLIC MEETINGS ACT OF 1971

■ The OPMA provides that "[a]ll meetings of the governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency, except as otherwise provided in this chapter." RCW 42.30.030. Failure to comply subjects members to civil penalties:

> (1) *Each member of the governing body who attends a meeting of such governing body where action is taken in violation of any provision of this chapter* applicable to him, *with knowledge of the fact that the meeting is in violation thereof, shall be subject to personal liability in the form of a civil penalty* in the amount of one hundred dollars. The civil penalty shall be assessed by a judge of the superior court and an action to enforce this penalty may be brought by any person.

RCW 42.30.120 (emphasis added). Thus, to enforce this provision, the party bringing the action must show (1) that a "member" of a governing body (2) attended a "meeting" of that body (3) where "action" was taken in violation of the OPMA, and (4) that the member had "knowledge" that the meeting violated the OPMA.

■ Our review of Wood's claim is de novo because it involves interpreting and construing the OPMA. *Wash. State Republican Party v. Pub. Disclosure Comm'n*, 141 Wn.2d 245, 254, 4 P.3d 808 (2000). In construing statutes, we seek to effectuate the legislative intent, which we discern "from the statutory text as a whole, interpreted in terms of the general object and purpose of the legislation." *Group Health Coop. of Puget Sound v. Dep't of Revenue*, 106 Wn.2d 391, 401, 722 P.2d 787 (1986). *See also Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 807, 16 P.3d 583 (2001). We do not resort to statutory construction methods where the statutory language is plain and unambiguous.

*Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 515, 910 P.2d 462 (1996). A statute is ambiguous and, thus, subject to judicial construction if it is susceptible of more than one reasonable interpretation. *Vashon Island Comm. for Self-Gov't v. Boundary Review Bd.*, 127 Wn.2d 759, 771, 903 P.2d 953 (1995).

## A. "MEMBER" OF GOVERNING BODY—MEMBERS-ELECT

Wood contends that members-elect are "members" of the governing body for purposes of the OPMA before they take the oath of office. She argues that when a member-elect acts with the intent to evade the OPMA, public policy supports its application.

The OPMA does not define "member" and its definition of "governing body" is ambiguous. It defines "governing body" as "the multimember board, commission, committee, council, or other policy or rule-making body of a public agency, or any committee thereof when the committee acts on behalf of the governing body, conducts hearings, or takes testimony or public comment." RCW 42.30.020(2). The OPMA defines "action" as "the transaction of the official business of a public agency by a governing body including but not limited to receipt of public testimony, deliberations, discussions, considerations, reviews, evaluations, and final actions."[1] RCW 42.30.020(3).

The legislature declared the OPMA's purpose in forceful terms:

The legislature finds and declares that all public commissions, boards, councils, committees, subcommittees, departments, divisions, offices, and all other public agencies of this state and subdivisions thereof exist to aid in the conduct of the people's business. It is the intent of this chapter that their actions be taken openly and that their deliberations be conducted openly.

---

[1] "Final action" is also defined as "a collective positive or negative decision, or an actual vote by a majority of the members of a governing body when sitting as a body or entity, upon a motion, proposal, resolution, order, or ordinance." RCW 42.30.020(3).

> The people of this state do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created.

RCW 42.30.010. *See also* RCW 42.30.910 (directing that the OPMA be liberally construed); *Equitable Shipyards, Inc. v. State*, 93 Wn.2d 465, 482, 611 P.2d 396 (1980) ("We recognize the statutory statement of purpose in [the OPMA] employs some of the strongest language used in any legislation.").

The OPMA was modeled on California's and Florida's open meetings laws. 1971 Op. Atty. Gen. No. 33, at 2. Thus, decisions from those jurisdictions provide guidance in interpreting Washington law. *See Anaya v. Graham*, 89 Wn. App. 588, 592, 950 P.2d 16 (1998) (analogous federal laws provide guidance for statutory interpretation issues). But California and Florida courts have reached dissimilar conclusions on whether their open meetings laws cover members-elect.

A Florida appellate court applied that state's open meetings statute, the Government in the Sunshine Law, to a meeting between two councilmen-elect and one council member. *Hough v. Stembridge*, 278 So. 2d 288, 289 (Fla. Dist. Ct. App. 1973). In rejecting the argument that the gathering did not constitute a meeting of the governing body, the *Hough* court stated:

> We simply cannot accept this line of reasoning. To adopt this viewpoint would in effect permit as in the case sub judice members-elect of a public board or commission to gather with impunity behind closed doors and discuss matters on which foreseeable action may be taken by that board or commission in clear violation of the purpose, intent, and spirit of the Government in the Sunshine Law. . . .
>
> . . . An individual upon immediate election to public office loses his status as a private individual and acquires the position more akin to that of a public trustee.

278 So. 2d at 289. The court concluded that not to apply the

Sunshine Law to members-elect would frustrate the legislative intent and would violate the rule that courts should construe statutes enacted for the public benefit most favorably to the public. *Hough*, 278 So. 2d at 289-90.

In 1994, the California legislature amended the Ralph M. Brown Act, the open meeting law for local agencies, to include express language addressing members-elect. *See* CAL. GOV'T CODE § 54952.1 (West 1994) ("Any person elected to serve as a member of a legislative body who has not yet assumed the duties of office shall conform his or her conduct to the requirements of this chapter and shall be treated . . . as if he or she has already assumed office."). But a California court refused to apply the Brown Act to member-elect activity that occurred before the enactment of the amendment. *See 216 Sutter Bay Assocs. v. County of Sutter*, 58 Cal. App. 4th 860, 68 Cal. Rptr. 2d 492, 503 (1997).

Part of the alleged violations in *216 Sutter Bay* included private meetings between a current member of the county board of supervisors and two supervisors-elect. 68 Cal. Rptr. 2d at 503. The appellate court held that the legislature's amendment of the Brown Act to expressly apply its provisions to members-elect indicated a legislative intent to change existing law; thus, the court reasoned that the pre-amendment Brown Act did not apply to members-elect. *216 Sutter Bay*, 68 Cal. Rptr. 2d at 503.

■ Washington's OPMA is, at most, ambiguous as to its application to members-elect. Although the OPMA defines "action" broadly, nothing suggests that members-elect have the power to transact a governing body's official business before they are sworn in. Thus, they are not "members" of a governing body with authority to take "action."

■ Wood contends that applying the OPMA to members-elect is consonant with the legislative purpose. We do not disagree but we concur with the California court that it is "for the Legislature, not the judiciary, to determine a basic legislative question such as whether [members-elect are] covered." *216 Sutter Bay*, 68 Cal. Rptr. 2d at 506. Therefore,

it was error to grant summary judgment to Wood on her OPMA claim regarding acts of members-elect.[2]

B. "Meeting"—E-mail

Wood also argues that the Board members violated the OPMA by discussing Board business by private e-mails. She contends that the OPMA does not require the contemporaneous physical presence of the members to trigger its provisions.

 Again, the statutory language does not resolve the issue. The OPMA simply defines "meeting" as "meetings at which action is taken." RCW 42.30.020(4). And the broad definition of "action," as "the transaction of the official business . . . by a governing body including but not limited to receipt of public testimony, deliberations, discussions, considerations, reviews, evaluations, and final actions," could encompass various means of communication. RCW 42.30.020(3). Given the general definition of "meeting," combined with the directive to liberally construe the OPMA, we conclude that the legislature intended a broad definition of the word "meeting."

Elected officials no longer conduct the public's business solely at in-person meetings. *See, e.g., Stockton Newspapers, Inc. v. Members of the Redev. Agency,* 171 Cal. App. 3d 95, 214 Cal. Rptr. 561, 565 (1985) ("[I]f face-to-face contact of the members of a legislative body were necessary for a 'meeting,' the objective of the open meeting requirement of the Brown Act could all too easily be evaded."). Further, a definition of "meeting" that would require the physical presence of members in the same location would contravene the OPMA's clear purpose.[3]

Consequently, courts have generally adopted a broad

---

[2] The defendants also assert that applying the OPMA to members-elect infringes on their freedom of speech and association rights. But because we conclude that the OPMA does not apply to members-elect, we need not reach their constitutional argument.

[3] As the Florida Supreme Court stated more than 30 years ago:

During past years tendencies toward secrecy in public affairs have been the subject of extensive criticism. Terms such as managed news, secret meetings, closed records, executive sessions, and study sessions have become synonymous

definition of "meeting" to effectuate open meetings laws that state legislatures enacted for the public benefit.[4] *See, e.g., Stockton Newspapers*, 214 Cal. Rptr. at 565-66 (series of telephone calls between individual members and attorney to develop collective commitment or promise on public business violated Brown Act); *Blackford v. Sch. Bd.*, 375 So. 2d 578, 580 (Fla. Dist. Ct. App. 1979) (successive meetings between school superintendent and individual school board members violated Sunshine Law); *Del Papa v. Bd. of Regents of the Univ. & Cmty. Coll. Sys.*, 114 Nev. 388, 956 P.2d 770, 778 (1998) (use of serial electronic communication by quorum of public body to deliberate toward or to make a decision violates state open meeting law). *But see State ex rel. Stephan v. Bd. of County Comm'rs*, 254 Kan. 446, 866 P.2d 1024, 1027 (1994) (state open meetings act did not apply to telephone calls where "meeting" was statutorily defined as a "prearranged gathering or assembly"; thus a "meeting" required a physical gathering of the members of a public body).

Admittedly, unlike Washington, some states have explicitly addressed the use of electronic or other technological means of evading these laws. But unlike those states, Washington broadly defines "meeting" as "meetings at which action is taken," regardless of the particular means used to conduct it.[5] *See* Attorney General's *Open Records &*

---

with "hanky panky" in the minds of public-spirited citizens. One purpose of the Sunshine Law was to maintain the faith of the public in governmental agencies. Regardless of their good intentions, these specified boards and commissions, through devious ways, should not be allowed to deprive the public of this inalienable right to be present and to be heard at all deliberations wherein decisions affecting the public are being made.

*Bd. of Pub. Instruction v. Doran*, 224 So. 2d 693, 699 (Fla. 1969).

[4] For example, the Washington Attorney General's *Open Records & Open Meetings Deskbook*, 1.3A notes that "telephone trees," where members repeatedly phone each other to form a collective decision, are inappropriate under the OPMA. *See* http://www.wa.gov/ago/records/chapter1.html (last visited July 12, 2001).

[5] *See, e.g.,* CAL. GOV'T CODE § 54952.2(a), (b) (West 1994) (defining "meeting" as "any congregation of a majority of the members of a legislative body at the same time and place to hear, discuss, or deliberate" and directing that "any use of direct communication, personal intermediaries, or technological devices that is employed by a majority of the members . . . to develop a collective concurrence as to

*Open Meetings Deskbook*, 1.3B. http://www.wa.gov/ago/records/chapter1.html (last visited July 12, 2001) ("A meeting occurs if a majority of the members of the governing body were to discuss or consider [agency business] no matter where that discussion or consideration might occur.").

■ Thus, in light of the OPMA's broad definition of "meeting" and its broad purpose, and considering the mandate to liberally construe this statute in favor of coverage, we conclude that the exchange of e-mails can constitute a "meeting." In doing so, we also recognize the need for balance between the right of the public to have its business conducted in the open and the need for members of governing bodies to obtain information and communicate in order to function effectively.[6] Thus, we emphasize that the mere use or passive receipt of e-mail does not automatically constitute a "meeting."

■ The OPMA is not violated if less than a majority of the governing body meet. *See In re Recall of Beasley*, 128 Wn.2d 419, 427, 908 P.2d 878 (1996) (citing *In re Recall of*

action to be taken on an item by the members . . . is prohibited"); Iowa CODE ANN. § 21.2(2) (West 1993) (" 'Meeting' means a gathering in person or by electronic means, formal or informal, of a majority of the members of a governmental body where there is deliberation or action upon any matter within the scope of the governmental body's policy-making duties."); KAN. STAT. ANN. § 75-4317a (1994) (" '[M]eeting' means any gathering, assembly, telephone call or any other means of interactive communication by a majority of a quorum of the membership of a body or agency . . . for the purpose of discussing the business or affairs of the body or agency."); TENN. CODE ANN. § 8-44-102(b)(2) (1998) (defining "[m]eeting" as "the convening of a governing body of a public body for which a quorum is required in order to make a decision or to deliberate toward a decision").

[6] As a California court noted:

"There is a spectrum of gatherings of agency members that can be called a meeting, ranging from formal convocations to transact business to chance encounters where business is discussed. However, neither of these two extremes is an acceptable definition of the statutory word 'meeting.' Requiring all discussion between members to be open and public would preclude normal living and working by officials. On other hand, permitting secrecy unless there is formal convocation of a body invites evasion."

*Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors*, 263 Cal. App. 2d 41, 69 Cal. Rptr. 480, 487 n.8 (1968) (quoting Robert Alan Blum, Comment, *Access to Governmental Information in California*, 54 CAL. L. REV. 1650, 1651 (1966)). *See also Regents of Univ. of Cal. v. Superior Court*, 20 Cal. 4th 509, 976 P.2d 808, 828-29, 85 Cal. Rptr. 2d 257 (1999) (Brown, J., concurring).

*Roberts*, 115 Wn.2d 551, 554, 799 P.2d 734 (1990)). And the participants must collectively intend to meet to transact the governing body's official business. *See* 1971 Op. Atty. Gen. No. 33, at 19 (social function can be a meeting if it is scheduled or designed to discuss official business); *Roberts v. City of Palmdale*, 5 Cal. 4th 363, 853 P.2d 496, 503, 20 Cal. Rptr. 2d 330 (1993) (Brown Act applies to collective action, not the passive receipt of e-mail by members absent a concerted plan to engage in collective deliberation). Finally, the governing body members must communicate about issues that may or will come before the Board for a vote; in other words, the members must take "action" as the OPMA defines it.

Thus, the OPMA is not implicated when members receive information about upcoming issues or communicate amongst themselves about matters unrelated to the governing body's business via e-mail. *See, e.g.*, RCW 42.30.070 ("It shall not be a violation . . . of this chapter for a majority of the members of a governing body to travel together or gather for purposes other than a regular meeting or a special meeting[.]"); *Equitable Shipyards, Inc. v. State*, 93 Wn.2d 465, 482, 611 P.2d 396 (1980) (independent and individual examination of documents by commission members prior to open meeting where contract was awarded did not violate the OPMA).

Applying these standards here, Wood has established a prima facie case of "meeting" by e-mails. The post-oath e-mail discussions involved a quorum of the five-member Board. For instance, on November 30, Sharp sent an e-mail to all Board members and another e-mail to three of the members; on December 1, Sharp again e-mailed all the Board members, attaching a response he had received from Striker about a matter they had discussed; next, on December 3, Kim e-mailed Sharp and copied three other Board members in response to Sharp's earlier e-mail; and on December 5, Sharp again e-mailed all Board members.

Further, these discussions related to Board business, including the possibility of instituting a declaratory judg-

ment in regard to Beck's contract with the District and otherwise evaluating Beck's performance, and the structuring of the Board's liaison duties. And the active exchange of information and opinions in these e-mails, as opposed to the mere passive receipt of information, suggests a collective intent to deliberate and/or to discuss Board business. Thus, there are genuine issues of material fact as to whether the members held a meeting, as the OPMA defines that word, by e-mail.

C. "KNOWLEDGE"

 Under the OPMA, individual members of a governing body are subject to civil penalties only if they attend a meeting *knowing* that it was in violation of the OPMA. RCW 42.30.120(1). *See also Miller v. City of Tacoma*, 138 Wn.2d 318, 331, 979 P.2d 429 (1999) (civil penalties under RCW 42.30.120 inappropriate because city council members believed they were acting within the law); *Cathcart v. Andersen*, 10 Wn. App. 429, 436-37, 517 P.2d 980 (1974) (civil penalties not appropriate where uncontroverted affidavits established that attorney general advised law school faculty that meetings did not violate the OPMA), *aff'd*, 85 Wn.2d 102, 530 P.2d 313 (1975). The defendants contend that because no Washington court has addressed the use of e-mail in this context, they could not have known they were violating the OPMA.

The evidence of actual knowledge is ambiguous. But the writers of some of the e-mails express their concerns about violating the OPMA, thereby indicating the possibility of constructive knowledge.[7] For example, one e-mail states that another individual had "indicated that the state Attorney General has expressed concerns relative to school board members being on school networks because of, naturally, discussing school issues with each other and possible violation of the open meeting act." II Clerk's Papers (CP) at 270. The e-mail continued in response: "True, but the issue

---

[7] The fifth Board member, Pat Cherry, indicated concern about possible OPMA violations and she asked to be excluded from the e-mail exchange sometime after the new Board members were sworn in.

of ISP [(internet service provider)] is separate from the issue of [the] OPMA. Regardless of the service provider, if we are violating the spirit of [the] OPMA by making decisions over the internet, fax, or voice, we are still conducting illegal meetings."[8] II CP at 270.

Thus, unlike *Cathcart*, the e-mail discussions show an awareness of possible OPMA violations and controvert the defendants' declarations that they did not know they were violating the law when they discussed Board business by e-mail. Further, applying the OPMA in this type of case is clearly within the OPMA's purpose and its broad definition of both "meeting" and "action."[9] As reasonable persons viewing the evidence could differ as to whether the defendants knew their e-mails violated the OPMA, summary judgment was improper. *See Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

Consequently, we reverse the trial court's grant of summary judgment in favor of Wood and dismiss her claims of pre-oath OPMA violations. But finding that Wood has raised genuine issues of material fact as to whether post-oath e-mails violated the OPMA, we remand those claims for trial.

## DEFAMATION

### A. SUMMARY JUDGMENT—DEFAMATION

A prima facie defamation case requires a showing (1) that the defendant's statement was false, (2) that it was unprivileged, (3) fault, and (4) that the statement proximately caused damage. *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981); *Moe v. Wise*, 97 Wn. App. 950, 957, 989 P.2d 1148 (1999), *review denied*, 140

---

[8] Although the timing and the exact recipients of the e-mail are unclear from the record, there is another e-mail between at least Kim and Sharp in which Sharp notes that someone suggested to him "that an email message from one board member sent to more than one other board [member] might constitute a violation of the OPMA." II CP at 337.

[9] Although no Washington court has addressed this issue, the Municipal Research & Services Center's report on the application of the OPMA to cities, towns, and counties states that discussing agency business over the telephone may be a meeting and it specifically raises the issue of e-mail.

Wn.2d 1025 (2000). To avoid a defense summary judgment, the plaintiff must raise an issue of fact as to each element. *Mark*, 96 Wn.2d at 486.

Generally, in defamation cases, the standard of proof at trial also applies at summary judgment. *Haueter v. Cowles Publ'g Co.*, 61 Wn. App. 572, 581, 811 P.2d 231 (1991). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The degree of fault and quantum of proof necessary to establish a prima facie case turns on whether Sharp had a privilege and whether Wood was acting as a private individual or as a public official. *Bender v. City of Seattle*, 99 Wn.2d 582, 599, 664 P.2d 492 (1983); *Moe*, 97 Wn. App. at 957, 963. Absent a privileged defendant, a private individual must merely prove negligence by a preponderance of the evidence. *Moe*, 97 Wn. App. at 957, 963; *Haueter*, 61 Wn. App. at 582. But a public official must prove actual malice, i.e., knowledge of falsity or reckless disregard of the truth or falsity, by clear and convincing evidence. *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 169-70, 736 P.2d 249 (1987); *Moe*, 97 Wn. App. at 957.

### 1. Privilege—Absolute or Qualified/Conditional

 Sharp argues that he had either an absolute or a conditional privilege because of his position as school board president. The existence of a privilege is a question of law for the court. *Twelker v. Shannon & Wilson, Inc.*, 88 Wn.2d 473, 479, 564 P.2d 1131 (1977); *Corbally v. Kennewick Sch. Dist.*, 94 Wn. App. 736, 742, 973 P.2d 1074 (1999).

 Because an absolute privilege absolves the defendant of all liability for defamatory statements, it is generally limited to "cases in which the public service and administration of justice require complete immunity." *Bender*, 99 Wn.2d at 600 (examples include legislatures in debate, judges, attorneys, parties and witnesses in judicial proceedings, and executive or military personnel acting within their duties). Thus, the court will not extend complete immunity to a position absent a compelling public

policy justification. *Moore v. Smith*, 89 Wn.2d 932, 937, 578 P.2d 26 (1978). *See also Bender*, 99 Wn.2d at 600-01 (qualified privilege sufficient to protect police officers releasing information to the public and the press). We find no such justification for conferring an absolute privilege on a school board president.

Sharp relies on *Liberty Bank of Seattle, Inc. v. Henderson*, 75 Wn. App. 546, 878 P.2d 1259 (1994), to support his claim of an absolute privilege. The *Liberty Bank* court held that the supervisor of banking and a duly appointed conservator were absolutely privileged and it rejected the plaintiff's assertion that the privilege was limited to elected officials of cabinet rank. 75 Wn. App. at 564. *Liberty Bank* is not persuasive because the officials in that case had significantly different responsibilities than a school board president. *See also Stidham v. Dep't of Licensing*, 30 Wn. App. 611, 614-15, 637 P.2d 970 (1981) (director and assistant director of department have absolute privilege); *Sidor v. Pub. Disclosure Comm'n*, 25 Wn. App. 127, 133-34, 607 P.2d 859 (1980) (commissioners and commission's administrator have complete immunity).

Sharp, as an inferior state officer, is entitled to a qualified privilege. The *Restatement (Second) of Torts* § 598A (1977) provides that "[a]n occasion makes a publication conditionally privileged if an inferior administrative officer of a state or any of its subdivisions who is not entitled to an absolute privilege makes a defamatory communication required or permitted in the performance of his official duties." The school board president is an inferior state officer under state law. *See* RCW 28A.315.005(2) (local school districts are political subdivisions of the state); *Edmonds Sch. Dist. No. 15 v. City of Mountlake Terrace*, 77 Wn.2d 609, 611-12, 465 P.2d 177 (1970).

A qualified privilege may be lost if abused, and the defamation plaintiff must show abuse by clear and convincing evidence. *Bender*, 99 Wn.2d at 600-01; *Moore*, 89 Wn.2d at 938. To prove abuse, a plaintiff must show the speaker's knowledge of the statement's falsity or reckless disregard

for the truth or falsity of the statement, in other words, actual malice. *Bender*, 99 Wn.2d at 601-02 (adopting standard of the *Restatement (Second) of Torts* § 600, at 288 (1977)). Proof of falsity alone will not overcome the privilege. *Mark*, 96 Wn.2d at 492.

Wood's evidence of actual malice includes: (1) that Sharp knew of Wood's good to excellent performance evaluations a month before he made the statement; (2) that he had little direct contact with her on which to base his statement; (3) that he based his statement on an incident that two district patrons reported to him, on information from a district employee who left her job at the end of her 90-day probationary period, and on mistakes in District publications; and (4) that Sharp had made it known for some time that he wanted to remove Wood from the District.

Sharp does not dispute that even before his election to the Board, Wood was one of three District employees he believed were unqualified for the positions they held and/or were overpaid. He claims that he based this belief on comments from several people including Beck, the three interim superintendents, and Board members Kim, Striker, and Sonntag. But the declarations of Beck and the interim superintendents do not support this contention; the interim superintendents stated that Sharp asked them "to find a way to get rid of" Wood but they reported back to him that there was no "for cause" basis for termination.[10] II CP at 98. And Wood's performance evaluations before and after she took on the communications coordinator position are uniformly strong to excellent.

Finally, despite Sharp's vague reference to discussions about the poor quality of some of the District's publications, he could recall only one specific publication that caused him concern. Further, all he specified about that one publication was an issue related to grammar.

This evidence was sufficient to raise a genuine issue

[10] In Sharp's deposition, he admits that at the November 26 executive session he stated that he thought "it would be nice to begin to document those things, gather information concerning [Wood's] job performance." II CP at 195.

of material fact as to Sharp's abuse of his privilege by recklessly disregarding the truth or falsity of his statement to the press. Because there is "evidence reasonably tending to show actual malice, [Wood] has the right . . . to have the question of malicious excess of privilege submitted to the jury upon such evidence." *Kauzlarich v. Yarbrough*, 105 Wn. App. 632, 643, 20 P.3d 946 (2001). *See also Moe*, 97 Wn. App. at 962 (question whether speaker abused privilege is generally for the jury but the court decides as a matter of law whether a party has established a prima facie case of abuse).

### 2. Public Official / Private Individual

The trial court found that Wood was a private individual. Sharp contends that Wood was a public official because of her responsibilities and authority as the District's communications coordinator.

Whether establishing an abuse of a qualified privilege or proving fault when the plaintiff is a public official, a plaintiff must prove actual malice. *Moe*, 97 Wn. App. at 964-65; *Haueter*, 61 Wn. App. at 588 n.5. Because we conclude that Sharp is entitled to a qualified privilege and, thus, Wood must prove actual malice, her status as a private individual or public official is not determinative of any remaining issue. Thus, we need not reach this issue.

### 3. Falsity

A defamation claim must be based on a provably false statement and the plaintiff bears the burden of proving the falsity.[11] *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590-91, 943 P.2d 350 (1997). *See also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). To be actionable, "it must be apparent

---

[11] The Supreme Court has suggested three factors to consider in distinguishing actionable from nonactionable statements, including "(1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts." *Dunlap v. Wayne*, 105 Wn.2d 529, 539, 716 P.2d 842 (1986). Here, the medium and context, a newspaper article, and the audience, the general public, suggest that the statement is actionable. Further, as discussed in more detail later, the statement implied undisclosed facts about Wood's job performance.

that the false statement or communication presents a substantial danger to the plaintiff's personal or business reputation." *Ernst Home Ctr., Inc. v. United Food & Commercial Workers Int'l Union Local 1001*, 77 Wn. App. 33, 44, 888 P.2d 1196 (1995).

A statement may be provably false if it (1) falsely represents the speaker's state of mind, (2) falsely attributes the statement to a person who did not make it, or (3) falsely describes the act, condition or event comprising the statement's subject matter. *Schmalenberg*, 87 Wn. App. at 591. The court must decide whether the statement is capable of a defamatory meaning and the jury decides whether the statement was, in fact, defamatory. *Swartz v. World Publ'g Co.*, 57 Wn.2d 213, 215, 356 P.2d 97 (1960); *Ernst Home Ctr.*, 77 Wn. App. at 44.

Wood argues that Sharp's statement falsely implied that she was being reassigned or leaving the District because her job performance was lacking and that Sharp falsely characterized that performance. Sharp responds that his statement about Wood's job performance was true and, in the alternative, that he truthfully expressed his belief about her performance. He also contends that there is not a genuine issue of material fact as to whether Wood's performance was "lacking."

The trial court erred in concluding that there was not an issue as to whether Sharp's statement was false. Sharp's statement to the press implied there were provable facts to support his conclusion that Wood's performance as *communications coordinator* was lacking and it suggested that Wood's deficient job performance was the basis for her reassignment and/or for the decision not to renew her contract.

Further, Wood provided substantial evidence contradicting Sharp's evidence about the quality of her work, including a performance evaluation and the declarations of her supervisors and other staff. Thus, reasonable persons could differ on the truth or falsity of Sharp's statement. *See Wilson*, 98 Wn.2d at 437.

*4. Damages*

██ ██ When a defendant's statement contains both true and false elements, a defamation plaintiff may not recover damages if the damages would have occurred without the false portions. *Schmalenberg*, 87 Wn. App. at 598. Thus, the issue is "whether the false statement has resulted in damage which is distinct from that caused by true negative statements also contained in the same report." *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 771, 776 P.2d 98 (1989); *Schmalenberg*, 87 Wn. App. at 598 ("[A] defamation plaintiff may not recover without showing that the false part of the statement increased its 'sting.' "). *See also Herron*, 112 Wn.2d at 769 ("The 'sting' of a report is defined as the gist or substance of a report when considered as a whole."). A defendant need prove only that the statement or the gist, that portion carrying the "sting," is substantially true. *Mark*, 96 Wn.2d at 494.

Here, Sharp's statements to the press regarding Wood's reassignment and nonrenewal of her contract were true. But his reference to Wood's deficient performance added a distinctly different "sting," suggesting to a reasonable reader that the deficiency was the reason for the reassignment and nonrenewal.

██ ██ A defamation plaintiff may recover for actual injuries only. *Taskett v. KING Broad. Co.*, 86 Wn.2d 439, 447, 546 P.2d 81 (1976). Further, "a trier of fact cannot presume damages under the libel per se doctrine unless liability is based upon malice." *Story v. Shelter Bay Co.*, 52 Wn. App. 334, 346, 760 P.2d 368 (1988). *See also Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters*, 100 Wn.2d 343, 354, 670 P.2d 240 (1983).

To establish that Sharp abused his qualified privilege, Wood has to prove actual malice. If she does so, she may be entitled to presumed damages under the libel per se doctrine. *See Caruso*, 100 Wn.2d at 354; *Story*, 52 Wn. App. at 346. "A defamatory publication is libelous per se (actionable without proof of special damages) if it (1) exposes a living person to hatred, contempt, ridicule or obloquy, to deprive

him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office." *Caruso*, 100 Wn.2d at 353.

The court generally determines whether a statement is libelous per se but if the issue involves "the rather vague areas of public confidence, injury to business, etc.," then it becomes a question of fact for the jury. *Caruso*, 100 Wn.2d at 353. Whether Sharp's statement was libelous per se involves this more vague area of public confidence and injury to Wood's pecuniary interest and, thus, it is a question for the jury.

As Wood has created genuine issues of material fact as to Sharp's abuse of his qualified privilege, the falsity of his statement, and her entitlement to damages, the trial court erred in dismissing her defamation claim on summary judgment.

### B. Motion For Reconsideration

Wood moved for reconsideration of summary judgment on her defamation claim, focusing on the issue of falsity. Sharp then moved for CR 11 sanctions, alleging that her motion was frivolous. The court denied both motions. As we reverse the trial court's summary judgment ruling, the issue raised on reconsideration is moot and we do not consider it.

### C. CR 11 Sanctions

CR 11 is intended to address filings not grounded in fact and not warranted by law, or filed for an improper purpose. *Bryant v. Joseph Tree, Inc.*, 119 Wn.2d 210, 217, 829 P.2d 1099 (1992). But as CR 11 sanctions also have a potential chilling effect, they must be balanced with the purpose behind the rule. *Bryant*, 119 Wn.2d at 219. "To avoid the 20/20 hindsight view, the trial court must conclude that the claim clearly has no chance of success." *In re Cooke*, 93 Wn. App. 526, 529, 969 P.2d 127 (1999). We review the trial court's sanctions decisions for an abuse of discretion. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 338, 858 P.2d 1054 (1993).

Sharp asserts that Wood's reconsideration motion was

not well grounded in fact because it did not identify facts or controlling legal authority that the trial court had overlooked or had not previously considered in regard to the summary judgment motions. But he has failed to show how the trial court's decision was unreasonable or based on untenable grounds. *See Cooke*, 93 Wn. App. at 529. Wood filed her motion for reconsideration on only one issue, the question of falsity, which was not clear cut. And Wood's failure to convince the trial court does not entitle Sharp to CR 11 sanctions. *See Doe v. Spokane & Inland Empire Blood Bank*, 55 Wn. App. 106, 111, 780 P.2d 853 (1989) ("CR 11 does not provide for sanctions, however, merely because an action's factual basis proves deficient or a party's view of the law proves incorrect; CR 11 is not a mechanism for providing attorney's fees, otherwise unavailable, to a prevailing party.").

Consequently, we reverse the summary judgments on Wood's OPMA and defamation claims and remand both for trial.

MORGAN and BRIDGEWATER, JJ., concur.