# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JIMMY and DEBORAH HILLIARD, individuals, | No. 51787-6-II |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| LEWIS COUNTY WATER & SEWER DISTRICT #5, a Public Agency, and VIRGIL R. FOX, CAROL A. FOX, Commissioners, and KRISTINE J. CARTER, former Commissioner, | |
| Respondents. | |

MAXA, C.J. – Jimmy and Deborah Hilliard (the Hilliards) filed a lawsuit alleging multiple violations of the Open Public Meetings Act (OPMA), chapter 42.30 RCW, by Lewis County Water and Sewer District No. 5 (the District) and Virgil Fox, Carol Fox, and Kristine Carter as District commissioners (collectively, the commissioners).[1] The Hilliards appeal the trial court's summary judgment ruling that the respondents did not violate the OPMA.

The Hilliards' OPMA lawsuit arises from the District's practice of sending vouchers signed by two of the three commissioners to the Lewis County Treasurer for payment of District

---

[1] Where appropriate, we refer to both the District and the commissioners collectively as the respondents. And for clarity, we refer to several of the parties by their first names. No disrespect is intended.

expenses, obligations, and payroll. The Hilliards claim that each time the commissioners signed a payment voucher they were subject to the OPMA because they were conducting a "meeting" as defined in the OPMA. The Hilliards also claim that the respondents violated the OPMA when they did not give proper notice for a special meeting in August 2016 that the respondents characterize as a meeting that did not require notice because it addressed an emergency.

Regarding the payment vouchers, we hold that the commissioners' signing of the payment vouchers was not a violation of the OPMA because they did not collectively intend to meet when they signed the vouchers and an administrative implementation of a governing body's prior decision is not an action for purposes of the OPMA.[2] Regarding the August 2016 meeting, we hold that (1) there is a genuine issue of material fact whether the special meeting was in response to an emergency because the respondents did not prove that even a one-day delay in holding the meeting would substantially increase the likelihood of property damage, and (2) the trial court must determine on remand whether the commissioners believed their actions violated the OPMA.

Accordingly, we affirm the trial court's summary judgment order in favor of the respondents regarding the commissioners' signing of the payment vouchers, but we reverse the court's summary judgment order regarding the August 19, 2016 meeting and remand for further proceedings.

---

[2] Regarding the vouchers, the Hilliards also appeal the trial court's rulings regarding application of the statute of limitations, whether the commissioners had knowledge that their conduct violated the OPMA, and whether only a single penalty could be assessed for multiple first-time OPMA violations. Because of our holdings regarding OPMA violations, we do not address these rulings.

FACTS

*Water and Sewer District No. 5*

In the 1980s, Virgil and Carol Fox purchased land in rural Lewis County with the intention of building a large residential development. In 1995, the County approved the creation of a sewer district to plan and construct sewage disposal facilities to serve the development. The sewer district subsequently was expanded to include operation of a water system owned by a corporation that Virgil and Carol owned. In 2003, Virgil and Carol's corporation sold the water system to the District, although Virgil and Carol loaned the money to the District to make the purchase.

Virgil and Carol served as the only commissioners for the District until 2006. Until that time, the only residents in the development were Virgil and Carol, one of their sons, and residents of four mobile homes Virgil and Carol had installed.

In 2006, another person built a house in the development and that person became the third commissioner in 2007. However, that person moved away and resigned in 2009. Virgil and Carol again were the only two commissioners until 2011. In November 2010, Carter was hired as the District's secretary.

In 2010, the Hilliards moved into the development. In April 2011, Jimmy Hilliard was appointed as the third commissioner along with Virgil and Carol. Jimmy served as commissioner until he resigned in December 2011. Another person then was appointed commissioner and served until December 2013. Virgil and Carol resigned as commissioners in 2012 and were replaced.

An election for District commissioners was held in November 2013. Virgil, Carol, and Carter were elected and took office in December 2013. Carter served until resigning effective January 2016. Dennis Eros subsequently was appointed as a commissioner.

*Board of Commissioners Approval of Expenditures*

At an August 2010 meeting, the board of commissioners approved pay rates for persons performing work for the District, including Virgil, Carol, and a person serving as District secretary. At an April 2012 meeting, the board of commissioners (which no longer included Virgil and Carol) ratified a contract with Virgil to serve as District manager at a monthly salary of $700.

At an October 2013 meeting, the board of commissioners ratified the 2003 contact between Virgil and Carol's corporation and the District for the sale of the water system. The contract authorized a monthly payment $2,584.58 to Virgil and Carol.

At a June 11, 2014 meeting, the board of commissioners "decided that the secretary would be authorized to pay all normal bills such as power, phone[,] etc. and simply report that action at the next regular meeting. In the case of unusual bills, such bills would be held for official Commissioner approval at the next meeting." Clerk's Papers (CP) at 447-48. At an August 6, 2014 meeting, the board of commissioners authorized Virgil "to spend not more than $300.00 per month for repair parts or other incidental necessities without board approval." CP at 450.

*Payment Vouchers*

The Lewis County treasurer served as the District's treasurer. To pay bills and payroll, the County required the District to send vouchers signed by two commissioners to the treasurer.

The District submitted three types of documents to the treasurer. A document entitled "Payment Voucher" was for bills, which were attached to the voucher. The payment voucher also was used for other payments for which the district was obligated, including the monthly payments to Virgil and Carol on the water system contact. At the bottom of the payment voucher were two identical certifications to be signed by a commissioner, which stated as follows:

> I, the undersigned do herby certify under penalty of perjury, that the materials have been furnished, the services rendered or the labor performed as described herein, and that the claim is a just, due and unpaid obligation against the County of Lewis and that I am authorized to authenticate and certify to said claim.

E.g., CP at 1087 (capitalization omitted).

A document entitled "Claim for Personal Expenses" was used to reimburse a District representative for out-of-pocket expenses, support for which was attached. This claim form contained a "Personal Certification" that the expenses had been incurred by the claimant. The form also contained a "Department Certification," which stated, "I, the undersigned, do hereby certify under penalty of perjury that the claim is a just, due and unpaid obligation against the County of Lewis, and that I am authorized to certify to said claim." E.g., CP at 1079.

A printout entitled "Payroll Time Sheets" was for payroll expenses. At the bottom was the following certification:

> I certify that according to the best of my knowledge the above payroll is a true and correct record of employee salary and compensable hours worked. Above listed payroll represents a legitimate claim against this organization, and no part thereof has been previously presented for appropriation or payment, unless noted above.

E.g., CP at 1073. Underneath was "Authorized by" and signature lines for three commissioners. E.g., CP at 1073.

Typically, Carter as secretary would handle the payment vouchers. She would affix an invoice to the voucher and circulate it for signature. The commissioners generally did not discuss the vouchers before signing them.

Virgil stated in a declaration that "[a]ll of the expenditures identified in the vouchers and payroll time sheets at issue were authorized by the commissioners in an open public meeting." CP at 322. In addition, Carter stated in a declaration that all payment vouchers after June 11, 2014 (other than the payments to Virgil and Carol) involved normal District expenses as contemplated by the board of commissioners' authorization on that date.

Jimmy stated in a declaration that he did not know until May 2015 that the District submitted payment vouchers to the County to pay expenses and payroll. He stated that during his time as a commissioner he never discussed, approved, or signed any payment vouchers.

*Audit of Operations*

At Virgil's request, the state auditor performed a series of audits of the District's operations. The first audit, for 2009-2011, identified an OPMA violation not related to payment vouchers. The second audit, for 2012-2013, noted that the OPMA violation had been cured. The third audit, for 2014-2015, documented no OPMA-related findings. All three audits specifically reviewed the District's compliance with the OPMA, and made no findings regarding the District's method of submitting payment vouchers and payroll time sheets signed by two commissioners.

*August 2016 Pump Failure*

On August 15, 2016, Virgil discovered that one of the District's two sewer pumps had failed. He removed the pump on August 17. On August 18, Virgil investigated the possibilities for either repairing or replacing the broken pump.

6

Virgil asked Eros if he would be available for a special meeting about the pump failure. Eros responded that he would only be available on August 19 at 7:00 AM. At 8:59 AM on August 18, Virgil asked Carol to post a notice about the meeting. Carol posted the notice around 9:20 AM on August 18. The commissioners met as scheduled on August 19 and approved the repair of the pump.

*Complaint*

On February 3, 2017, the Hilliards filed a complaint against the District, Virgil, Carol, and Carter alleging violations of the OPMA. The complaint alleged that the District and the commissioners had committed at least 263 violations of the OPMA from December 2013 to February 2017. Specifically, the Hilliards alleged that the commissioners had violated the OPMA by signing payment vouchers outside of open public meetings. In addition, the Hilliards alleged that Virgil and Carol failed to provide proper notice for a special meeting regarding the pump failure on August 19, 2016. The Hilliards requested that the trial court find the commissioners personally liable for knowing violations of the OPMA and award a $500 penalty for each violation.

The District filed a motion for partial summary judgment, arguing that the respondents had not violated the OPMA because signing payment vouchers to implement payments approved at open public meetings was not a meeting within the meaning of the OPMA and that the two-year statute of limitations for civil claims barred many of the Hilliards claims. The commissioners joined the District's motion and filed a separate summary judgment motion arguing that the Hilliards had failed to present any evidence establishing a question of material fact that the commissioners had knowingly violated the OPMA.

The trial court granted the respondents' summary judgment motions in part and dismissed all claims except the claims relating to the special meeting on August 19, 2016. The court rulings included that (1) the respondents did not violate the OPMA in approving payroll vouchers and payroll time sheets, (2) the two-year statute of limitations barred all claims arising before February 2, 2015, (3) RCW 42.30.120 allowed only a single $500 penalty to be assessed against any of the commissioners, and (4) there was no summary judgment evidence that any commissioner acted with knowledge that any conduct at issue violated the OPMA.

The District then filed another summary judgment motion, arguing that the meeting on August 19, 2016 was addressing an emergency and therefore failing to give 24-hour notice was not a violation of the OPMA under RCW 42.30.080(4). The trial court ruled that the Hilliards had failed to establish a question of material fact that the meeting was not addressing an emergency situation, and granted the District's summary judgment motion.

The Hilliards appeal the trial court's summary judgment orders.

ANALYSIS

A.    STANDARD OF REVIEW

We review a trial court's decision on a summary judgment motion de novo. *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 182, 401 P.3d 468 (2017). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). A genuine issue of material fact exists if reasonable minds could disagree on the conclusion of a factual issue. *Zonnebloem*, 200 Wn. App. at 182-83. We view all facts and reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Id.* at 182.

The moving party bears the initial burden of proving that there is no genuine issue of material fact. *Id.* at 183. Once a moving defendant shows that there is an absence of evidence to support the plaintiff's case, the burden shifts to the plaintiff to present specific facts that rebut the defendant's contentions and show a genuine issue of material fact. *Id.*

B.      APPLICABILITY OF OPMA TO SIGNING PAYMENT VOUCHERS

The Hilliards argue that the trial court erred by ruling that the respondents did not violate the OPMA when the commissioners signed payment vouchers authorizing the County treasurer to make payments on behalf of the District outside of open public meetings. We disagree.

1.   Legal Principles

The OPMA states, "All meetings of the governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency, except as otherwise provided in this chapter." RCW 42.30.030. The legislative intent underlying the OPMA is that for all public agencies, "actions be taken openly and . . . deliberations be conducted openly." RCW 42.30.010. The OPMA's purpose is to " 'allow the public to view the decisionmaking process at all stages.' " *Columbia Riverkeeper v. Port of Vancouver USA*, 188 Wn.2d 421, 434, 395 P.3d 1031 (2017) (quoting *Cathcart v. Andersen*, 85 Wn.2d 102, 107, 530 P.2d 313 (1975)). We must construe the OPMA liberally to effectuate that purpose. RCW 42.30.910.

a.   "Meeting" Requirement

RCW 42.30.030 limits the application of the OPMA to "meetings" of a public agency's governing body. And "the OPMA applies only to meetings where a majority of the governing body is present." *Citizens Alliance for Property Rights Legal Fund v. San Juan County*, 184 Wn.2d 428, 442-43, 359 P.3d 753 (2015). Under RCW 42.30.020(4), a meeting is a "meeting[]

9

at which action is taken." RCW 42.30.020(3) defines an "action" as "the transaction of the official business of a public agency by a governing body, including but not limited to receipt of public testimony, deliberations, discussions, considerations, reviews, evaluations, and final actions." "Unfortunately, while subsection (4) purports to define 'meeting,' it actually does no more than specify *when* meetings are subject to the OPMA without clarifying what a 'meeting' itself is." *Citizens Alliance*, 184 Wn.2d at 437.

Because the OPMA does not actually define "meeting," the Supreme Court in *Citizens Alliance* looked to *Black's Law Dictionary* for guidance. *Id.* at 443. The court stated that for a gathering of members of a governing body to constitute a meeting, "the gathering must be 'to discuss or act on matters in which' the attendees 'have a common interest.' " *Id.* (quoting BLACK'S LAW DICTIONARY 1131 (10th ed. 2014). In other words, "members of a governing body 'must *collectively intend to meet* to transact the governing body's official business' for their communications to constitute a meeting." *Citizens Alliance*, 184 Wn.2d at 443 (quoting *Wood v. Battle Ground Sch. Dist.*, 107 Wn. App. 550, 565, 27 P.3d 1208 (2001).

The definition of "meeting" does not require "the physical presence of members in the same location." *Wood*, 107 Wn. App. at 562. As a result, this court in *Wood* concluded that an "exchange of emails can constitute a 'meeting.' " *Id.* at 564. However, the "passive receipt of . . . one-way forms of communication" does not necessarily involve participation in a meeting. *Citizens Alliance*, 184 Wn.2d at 444. "If communications do not reflect the requisite collective intent to meet, no 'meeting' has occurred and the OPMA does not apply." *Id.*

Similarly, the independent examination of documents by individual governing body members does not constitute a "meeting" that violates the OPMA. *Equitable Shipyards, Inc. v. State*, 93 Wn.2d 465, 482, 611 P.2d 396 (1980); *see also Wood*, 107 Wn. App. at 565 (citing

*Equitable Shipyards* for the proposition that "the OPMA is not implicated when members receive information about upcoming issues").

      b.    "Action" Requirement

As noted above, whether a meeting has occurred also involves the definition of "action." A meeting for purposes of the OPMA is one at which an "action is taken." RCW 42.30.020(4). And an "action" involves the governing body's "transaction of the official business." RCW 42.30.020(3).

RCW 42.30.020(3) also contains a definition of "final action," which requires a decision or actual vote. But "action" is defined more broadly, to include "deliberations, discussions, considerations, reviews, [and] evaluations." RCW 42.30.020(3). Therefore, an "action" includes communicating about issues that may or will come before the governing body for a vote. *Wood*, 107 Wn. App. at 565.

      c.    Penalty – Knowledge Requirement

Under RCW 42.30.120(1), a member of a governing body who attends a meeting of the governing body where action is taken in violation of the OPMA "with knowledge of the fact that the meeting is in violation thereof" is subject to personal liability for a civil penalty. Any person can bring an action in superior court to enforce the civil penalty provision of the OPMA. RCW 42.30.120(3). The plaintiff has the burden of proving that the member of the governing body attended a "meeting" of that body, an action taken at the meeting violated the OPMA, and the member had knowledge that the meeting violated the OPMA. *Wood*, 107 Wn. App. at 558.

      d.    Statutory Interpretation

Determining whether certain conduct violates the OPMA requires this court to engage in statutory interpretation. *See Citizens Alliance*, 184 Wn.2d at 437. The purpose of statutory

interpretation is to give effect to the legislature's intent. *McColl v. Anderson*, 6 Wn. App. 2d 88, 91, 429 P.3d 1113 (2018). We first look to the statute's plain language, and consider the context of the statute, related provisions, as well as the statutory scheme as a whole. *Id.* We give undefined statutory terms their usual and plain meaning. *AllianceOne Receivables Mgmt., Inc. v. Lewis*, 180 Wn.2d 389, 395, 325 P.3d 904 (2014). Where possible, we construe statutes such that no clause, sentence, or word is made superfluous, void, or insignificant. *Spokane County v. Dep't of Fish & Wildlife*, 192 Wn.2d 453, 458, 430 P.3d 655 (2018).

When interpreting the OPMA, we adopt an interpretation that advances the legislative purpose. *See Citizens Alliance*, 184 Wn.2d at 437.

2. "Meeting" Analysis

The Hilliards argue that signing the payment vouchers constituted a "meeting" and involved an "action" as defined in the OPMA. We disagree.

Whether the commissioners participated in a meeting for purposes of the OPMA depends upon whether they collectively intended to meet to transact District business. *Citizens Alliance*, 184 Wn.2d at 443. Here, Virgil specifically stated that the commissioners did not meet to discuss the payment vouchers. He viewed the act of signing the vouchers as a purely administrative function to satisfy the County's procedures. Carol and Carter also considered signing the vouchers to be a routine administrative action. The Hilliards do not identify any evidence or inference from the evidence that the commissioners had a "collective intent to meet" as required by *Citizens Alliance*. 184 Wn.2d at 443.

Further, by signing the payment vouchers the commissioners were independently certifying that the expense had been incurred and the work performed, and that the claim involved a legitimate obligation of the District. This certification is similar to the independent

examination of documents by individual governing body members that the Supreme Court in *Equitable Shipyards* held did not constitute a "meeting" that violates the OPMA. 93 Wn.2d at 482.

We conclude that the commissioners' signing of the payment vouchers did not constitute a "meeting" as defined in the OPMA.

In addition, there is no evidence that signing the payment vouchers constituted an "action" as defined in the OPMA. RCW 42.30.020(3) lists examples of government actions that fall within the meaning of the statute, including testimony, deliberations, discussions, considerations, reviews, evaluations, and final actions. These actions all involve the decision-making process. And the OPMA's purpose is to allow the public access to that process. *Columbia Riverkeeper*, 188 Wn.2d at 434; *see also Miller v. City of Tacoma*, 138 Wn.2d 318, 324, 979 P.2d 429 (1999) (stating that the purpose of the OPMA "is to ensure public bodies make decisions openly").

But here the signing of the payment process did not involve the decision making process. The evidence shows that the board of commissioners already had authorized payment of the expenditures at issue here. The first payment voucher the Hilliards challenged was signed in December 2013. Before that time, the board of commissioners had authorized payment at certain hourly rates for work performed by various persons on behalf of the District; a monthly salary for Virgil; and the monthly payment to Virgil and Carol for sale of the water system. At its June 11, 2014 public meeting, the District authorized the secretary to pay "all normal bills" without additional approval at a commissioners' meeting. Carter submitted a declaration stating that the challenged payment vouchers after that date (other than the payments to Virgil and Carol) involved normal District expenses as contemplated by the June 11, 2014 authorization.

More broadly, Virgil stated in his declaration, "All of the expenditures identified in the vouchers and payroll time sheets at issue were authorized by the commissioners in an open public meeting." CP at 322. The Hilliards presented no testimony or evidence that refuted Virgil's statement. Therefore, the undisputed evidence presented at summary judgment showed that all the payment vouchers previously had been authorized by the board of commissioners.

Based on this evidence, the "actions" regarding the payment vouchers occurred when the board of commissioners approved payment of certain expenses and payroll charges in public meetings. The signing of the payment vouchers merely involved administrative or ministerial matters that implemented those actions.

The Hilliards rely on RCW 36.22.090, which states that a County can pay claims of political subdivisions "upon proper approval by the governing body thereof." They claim that signing the payment vouchers constitutes the required approval. However, as stated above, the board of commissioners previously had authorized expenditures reflected in the challenged payment vouchers. That authorization, not the act of signing the vouchers, satisfied the requirement of RCW 36.22.090.

We hold that signing the payment vouchers did not constitute a "meeting" or involve an "action" under the OPMA. Therefore, we hold that the OPMA does not apply to the signing of the payment vouchers and that the commissioner did not violate the OPMA by signing the vouchers.

C.    APPLICABILITY OF OPMA TO AUGUST 2016 MEETING

The Hilliards argue that the trial court erred by ruling on summary judgment that the RCW 42.30.080(4) exception to the notice requirement for emergency circumstances applied to the August 19, 2016 meeting. We agree.

14

1.    Legal Principles

RCW 42.30.080 addresses special meetings, and states that notice must be displayed at the agency's principal location at least 24 hours before the time of such special meeting. RCW 42.30.080(2)(c). RCW 42.30.080(4) provides an emergency exception to this notice requirement:

> The notices provided in this section may be dispensed with in the event a special meeting is called to deal with an emergency involving injury or damage to persons or property or the likelihood of such injury or damage, when time requirements of such notice would make notice impractical and increase the likelihood of such injury or damage.

Similarly, RCW 42.30.070 states that meeting notice requirements shall be suspended "[i]f, by reason of fire, flood, earthquake, or other emergency, there is a need for expedited action."

The Supreme Court considered the circumstances under which a governing body can invoke the emergency exception in *Mead School District No. 354 v. Mead Education Association*, 85 Wn.2d 140, 530 P.2d 302 (1975). There, the school district held a special meeting of the school board to authorize a lawsuit seeking to end a strike by the teachers union. *Id.* at 140-41. The school district argued that the special meeting was exempt from the OPMA's notice requirements because it was addressing emergency circumstances and that the disruption of the schools constituted an emergency. *Id.* at 143.

The court held that a situation requiring prompt action was not necessarily an emergency. *Id.* at 144. The court stated that "the 'emergency' [RCW 42.30.080] contemplates is a severe one." *Id.* The court noted that the parallel use of the word 'emergency' in RCW 42.30.070 gave examples of disaster situations such as fire, flood, or earthquake. *Id.* The court held that "[i]n order to dispense with the notice required by RCW 42.30.080, therefore, an emergency must exist which involves or threatens physical damage. The circumstances must be unexpected and

15

must call so urgently for action that even the 1-day delay the notice entails would substantially increase a likelihood of such injuries." *Id.* at 145.

2. Requirement of a Declaration of Emergency

Initially, the Hilliards argue that the RCW 42.30.080(4) emergency exception can apply only if the governing body expressly declares at the meeting that it is being held to address an emergency. They claim that the emergency exception is inapplicable here because there is no evidence that the board of commissioners treated the August 19, 2016 meeting as a special meeting dealing with an emergency.

However, nothing in RCW 42.30.080(4) requires that a governing body formally declare an emergency in order to invoke the emergency exception to the notice requirements. And the Hilliards cite no authority to support their position. Therefore, we reject the Hilliards' argument.

Nevertheless, if a true emergency exists, it might be expected that the governing body would note the presence of an emergency at the special meeting. Therefore, the failure to do so may be evidence that the special meeting was not called to address an emergency as defined in RCW 42.30.080(4).

3. Application of Emergency Exception

Here, the respondents acknowledge that the District did not provide proper notice for the special meeting on August 19, 2016. Therefore, in determining if the special meeting violated the OPMA the questions that must be resolved are whether (1) an emergency threatening property damage existed and (2) delaying the meeting in order to provide 24-hour notice would have substantially increased the likelihood of physical damage. RCW 42.30.080(4).

Virgil stated in a declaration that he treated the pump failure as an immediate problem. And the District submitted a declaration from an expert on wastewater infrastructure, who stated

16

that a sewage pump failure could quickly cause backups into homes and onto property. Virgil also stated that both of the District's sewage pumps had been in use for the same amount of time and the cause of the pump failure was not immediately apparent. This evidence supported a finding that there was an unexpected situation that threatened physical damage to property.

However, the evidence also showed that Virgil learned of the pump failure on August 15, but did not attempt to schedule a special meeting until August 17 or very early on August 18. And the board of commissioners did not actually hold a special meeting until August 19. Therefore, there is at least some evidence indicating that the situation was not so urgent that it was necessary to dispense with the 24-hour delay that providing proper notice for the special meeting would have required.

Further, there is no evidence in the meeting minutes that an emergency existed. Virgil talked about the pump failing and the need to repair it. But there was no suggestion that failure to repair the pump immediately would increase the risk of property damage. Virgil stated that he called the special meeting because the pump repair would require a sizeable expenditure and he need authorization to move forward.

Finally, what occurred after the meeting creates at least an inference that no emergency existed. Virgil picked up the repaired pump on September 1. But work to reinstall the pump was not started until September 8 and was not completed until September 10.

Accordingly, we hold that there is a genuine issue of material fact whether the RCW 42.30.080(4) emergency exception applied to dispense with the required notice for the August 19, 2016 special meeting.

17

4.    Knowledge Requirement

As noted above, a member of a governing body is subject to personal liability for a civil penalty for an OPMA violation only if the member has knowledge of the fact that the meeting violates the OPMA.  RCW 42.30.120(1).  The parties do not address this issue in the context of the August 19, 2016 meeting.  And the trial court did not rule on this issue.

Because the trial court did not address the knowledge requirement regarding the August 19, 2016 meeting, we remand for the trial court to make this determination.

D.    ATTORNEY FEES ON APPEAL

The Hilliards request reasonable attorney fees and costs on appeal under RAP 18.1 and RCW 42.30.120(4).  RCW 42.30.120(4) states that any person who prevails "against a public agency" in an action under the OPMA shall be awarded reasonable attorney fees and costs. Because we affirm the trial court regarding signing the payment vouchers, the Hilliards are not entitled to attorney fees on that issue.

The Hilliards may be entitled to a portion of their attorney fees on remand if they prevail regarding the August 2016 meeting.  But it is not yet known whether the Hilliards will prevail at trial against the District.

The District requests costs under RAP 14.2.  Because the parties each prevailed on an issue, we decline to award costs to any party.

CONCLUSION

We affirm the trial court's summary judgment order in favor of the respondents regarding the commissioners' signing of the payment vouchers, but we reverse the trial court's summary judgment order regarding the August 19, 2016 meeting and remand for further proceedings.

18

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, C.J.

We concur:

MELNICK, J.

SUTTON, J.