[No. 20078-7-III. Division Three. February 5, 2002.]

STEPHEN K. EUGSTER, *Appellant*, v. THE CITY OF SPOKANE, ET AL., *Respondents*.

---

214

*Stephen K. Eugster*, pro se.

*Meriwether D. Williams* (of *Winston & Cashatt, P.S.*), for respondents.

BROWN, A.C.J. — Stephen K. Eugster appeals the dismissal of his complaint against the City of Spokane, Spokane City Council, and four Council members over the selection process proposed to fill a vacant Council position. Mr. Eugster alleged violations of the Open Public Meetings Act (OPMA), chapter 42.30 RCW, entitling him to attorney fees, equitable relief and declaratory judgment. Before dismissal, Mr. Eugster unsuccessfully sought disqualification of the defendants' attorneys and CR 11 sanctions. Because genuine issues of material fact exist as to whether a "meeting" took place in violation of the OPMA, we affirm in part, reverse in part, and remand for fact finding and consideration of attorney fees.

## FACTS

In late 2000, a Spokane City Council (Council) position was vacated. The Spokane City Charter, section 8(b), provided vacancies were to be filled by a majority vote of the remaining Council members, but did not detail an exact process.

On January 2, 2001, the Council discussed the vacancy during its regularly scheduled legislative session. Council President Rob Higgins suggested each Council member submit five names from among the applicants. A committee of three Council members would then reduce the recommended applicants to five finalists who would be interviewed by the Council. In response, Council member Stephen Eugster opined that if the Council chose to follow this recommendation, the Council would need to adopt an interim rule. A motion to adopt President Higgins's suggestion passed by a majority vote (3-2), but was continued to the next meeting because it did not receive the necessary four votes to pass. Council member Phyllis Holmes was not present at this meeting. The matter was continued to January 8.

On January 8 at the Council's briefing session, President Higgins brought up a January 5 Memo to the Council suggesting a revised selection process and stating: "I think we've resolved the differences with the majority of the Council." Clerks Papers (CP) at 75. The memo indicated President Higgins formulated the suggestion in a meeting with Council members Roberta Greene and Steve Corker. Mr. Eugster refers to the process described in the January 5 Memo as the "Procedure" in his later filed complaint and in the briefing here.

Mr. Eugster asked if President Higgins was making the Procedure a new rule. President Higgins indicated the resolution was not a rule and explained: "This is a process that we're adopting for the interviews." CP at 75. Then, President Higgins elaborated: "And I believe, I've talked to each Council Member, the majority is in agreement that

this is a process that we'll use for this selection process." CP at 75-76. Mr. Eugster immediately objected:

First of all, you violated the Open Meetings Act because the process is a public, or a governmental action and you have to take that action in a public meeting. You can't go out and gather up your votes and then announce to the constituents or the electors of this City that you've reached a resolution. Secondly, a resolution, or your proposal, has to be adopted at a Council meeting as a rule, and you can only do that by properly submitting the matter as a legislative agenda item under our Council rules.

CP at 76.

President Higgins bypassed Mr. Eugster's concerns, stating:

Anything else? Okay. Any other comments? Okay. Thank you for your input. We'll go ahead and follow that process and hopefully come to some agreement on a Council position.

CP at 76. When pressed by Mr. Eugster, President Higgins explained he had "ruled that this is a legitimate process" and when pressed again, President Higgins ruled Mr. Eugster "out of order" and cut off discussion. CP at 77.

At the later legislative session on January 8, Mr. Eugster again voiced his concerns. In response, President Higgins indicated the January 5 Memo contained an error. The Council did not intend to "select" a final Council member in executive session. CP at 80. Later at the same session, responding to Council member Greene's request to explain the final process and the January 5 Memo, President Higgins granted that Mr. Eugster, "is correct when he— because the Memo was incorrect if it stated that we are going into Executive Session." CP at 82. Then, President Higgins related his understanding of the process, basically a reiteration of the January 5 Memo except for the stated correction. Instead of the Procedure, in the amended process the Council would "discuss" the finalists at executive session, then publicly vote at the January 29 regularly scheduled council meeting. CP at 82. For clarity we refer to this understanding as the "amended process."

The Council Action Memorandum of the January 8 events detailed President Higgins's briefing session remarks related to the Procedure: "He [President Higgins] noted that a majority of the Council Members is in agreement with this process." CP at 33. The Memorandum detailed the amended process as discussed in the later legislative session.

On January 9, Chief Administrative Assistant Reagan Oliver sent an e-mail to Mr. Eugster, explaining she had drafted the January 5 Memo in error. The memo should have read that the Council would "discuss" the final interviews in executive session with the actual selection to be made during a regular Council meeting. CP at 110.

On January 10, Mr. Eugster filed suit against the City, the City Council, President Higgins, and Council Members Corker, Greene and Holmes (Defendants). The complaint claimed: the Procedure was a final action violating the OPMA (Count 1); the Defendants conducted a meeting where action was taken with knowledge the meeting violated the OPMA (Count 2); the Procedure violated the City Charter because President Higgins did not have authority to establish the Procedure (Count 3); the Procedure violated the City Charter because it did not allow for majority selection of the new council member (Count 4); the Procedure violated Council rules by exceeding President Higgins's authority (Count 5); and because it was not adopted as required by Council rules (Count 6), the Procedure violated Robert's Rules of Order (Count 8, Count 7 was omitted); RCW 42.30.120 provided for attorney fees (Count 9); declaratory judgment was proper for the claimed controversies (Count 9, Count 9 is repeated); and, finally, Mr. Eugster claimed under the facts the OPMA granted authority for injunctive relief (Count 10).

On January 29, pursuant to a motion by Mr. Eugster, the trial court entered an order for the Defendants to show cause why, on February 13, the relief sought in Mr. Eugster's complaint, including equitable relief, civil penalties and attorney fees, should not be granted. Later, at the

January 29 City Council meeting, the Council considered and passed Resolution 01-05 to amend the City Council Rules of Procedure and establish a selection process for the vacant seat. Resolution 01-05 effectively superseded the amended process. Although the Resolution received a majority vote, it did not receive the necessary four votes to pass, and was continued to February 5, when it passed. Mr. Eugster does not challenge the validity of Resolution 01-05. The Resolution process was eventually used to select a new council member. On the 67th roll call, Mr. Eugster's proposed candidate was finally approved.

On the day before the February 13 show cause hearing, Mr. Eugster filed a motion to disqualify the Spokane City Attorney's office from jointly representing the named Defendants, along with a motion to shorten time for hearing on this motion. On February 13, the trial court considered the order to show cause based upon memoranda and affidavits, but declined to shorten time.

At the February 13 show cause hearing, the trial court reasoned that to violate the OPMA, a "meeting" had to occur, with an "action" taken. CP at 226. Noting the conjunctive "and" before the words "final action" in the definition of "action," the trial court interpreted the definition of action to require a "final action." CP at 227. Further, a "meeting" required the contemporaneous presence, whether in person or by telephone, of a majority of the Council. The court noted Council member Holmes was not present at any meeting at which any "action" took place. At most, three of six Council members engaged in discussions resulting in a permissible discussion draft, the Procedure. The trial court likened the discussions to "lobbying" or "running ideas up the flagpole." CP at 229-30. Thus, it reasoned the Procedure was merely a discussion draft.

Referring to the Procedure, the court noted the process described, if implemented, would have violated the OPMA because it called for an executive session vote. However, that concern was moot once the process was corrected

before adoption and application. Accordingly, the court denied Mr. Eugster's show cause motion.

On February 14, Mr. Eugster filed a second motion to disqualify the City Attorney's office from jointly representing the Defendants. The Defendants then filed a notice of substitution for Meriwether D. (Mike) Williams and the law firm of Winston & Cashatt, "subject to Court approval if an objection or request for further disqualification of counsel is made by plaintiff." CP at 235. At the same time, the Defendants noted a hearing for presentation and submitted their proposed order and judgment based upon the February 13 show cause hearing.

Mr. Eugster objected to the substituted counsel and requested further disqualification. Then the parties, beginning with the Defendants, filed cross-motions for CR 11 sanctions.

At the March 23 presentment, the trial court considered and rejected Mr. Eugster's objection to substituted counsel, as well as both CR 11 motions. The trial court reasoned Mr. Eugster lacked standing regarding disqualification. And the trial court concluded that, in light of the "de minimis" fine and moot issues, the "conflict of interest, to the extent that there really is one, is more theoretical and de minimis rather than one of substance." CP at 441. The court entered a final order dismissing Mr. Eugster's complaint. Mr. Eugster appealed.

## ANALYSIS

## A. OPMA

The broad issue is whether the trial court erred in dismissing Mr. Eugster's complaint as a matter of law based upon no evidence of an OPMA violation.

■■ The trial court dismissed Mr. Eugster's complaint as a matter of law, after reviewing evidence consisting entirely of affidavits. Thus, review is analogous to a summary judgment. *Brinkerhoff v. Campbell*, 99 Wn. App. 692,

696, 994 P.2d 911 (2000). We review de novo to determine if the evidence, viewed in a light most favorable to the nonmoving party, is sufficient to present a genuine issue of material fact so as to preclude judgment as a matter of law. CR 56(c); *Wood v. Battle Ground Sch. Dist.*, 107 Wn. App. 550, 557, 27 P.3d 1208 (2001). Where the parties ask this court to interpret and construe the OPMA, appellate review is de novo. *Id.* at 558.

██ The OPMA contains a powerful public policy statement. "The legislature finds and declares that all public commissions, boards, councils, committees, subcommittees, departments, divisions, offices, and all other public agencies of this state and subdivisions thereof exist to aid in the conduct of the people's business. It is the intent of this chapter that their actions be taken openly and that their deliberations be conducted openly." RCW 42.30.010; *see Equitable Shipyards, Inc. v. State*, 93 Wn.2d 465, 482, 611 P.2d 396 (1980) (the statement of purpose in the OPMA "employs some of the strongest language used in any legislation"). The purpose of the OPMA is to permit the public to observe all steps in the making of governmental decisions. *Cathcart v. Andersen*, 85 Wn.2d 102, 530 P.2d 313 (1975). We must give the OPMA a liberal construction to further its policies and purpose. RCW 42.30.910.

██ To defeat summary dismissal of an OPMA claim, the plaintiff must submit evidence showing "(1) that a 'member' of a governing body (2) attended a 'meeting' of that body (3) where 'action' was taken in violation of the OPMA, and (4) that the member had 'knowledge' that the meeting violated the OPMA." *Wood*, 107 Wn. App. at 558. Because no dispute exists about the Council members being members of a governing body, we focus on the last three elements.

## 1. Meeting

██ With certain exceptions, the OPMA dictates that "[a]ll meetings of the governing body of a public agency shall be open and public." RCW 42.30.030. A "meeting"

takes place when a majority of the governing body meets and takes "action." RCW 42.30.020(4); *Wood*, 107 Wn. App. at 564.

■ ■ Here, the Defendants argue no evidence of a "meeting" exists because the meeting with President Higgins and Council members Corker and Greene did not constitute a majority. Council member Holmes denies meeting in private with the other three Council member defendants. Nevertheless, the record contains competing inferences raising factual issues as to whether a meeting took place.

First, at the January 8 briefing session, President Higgins announced, "I think we've resolved the differences with the majority of the Council." CP at 75. While this alone may express speculation or conjecture, the January 5 Memo indicated the agreement of Council members Greene and Corker in a meeting with President Higgins. Without motion, President Higgins declared, "This is a process that we're adopting for the interviews." CP at 75. President Higgins "ruled that this is a legitimate process." CP at 77. President Higgins related: "And I believe, I've talked to each Council Member, the majority is in agreement that this is a process that we'll use for this selection process." CP at 75-76. The Council Action Memorandum reported regarding the January 8 briefing session: "He [President Higgins] noted that a majority of the Council Members is in agreement with this process." CP at 33.

Second, at the later legislative session on January 8, Council member Eugster, citing the OPMA, again raised the issue of the Procedure, stating, "the Council President announced that he had polled the members of the City Council and had gotten the consent of a majority of the members of the City Council with regard to a Council appointment process that he has included in a memorandum to us dated January 5, 2001." CP at 79. President Higgins responded in essence that the amended process was what had been intended with the selection of a council

member to be made in a public, not an executive session, but did not respond to the polling charge.

Third, Council member Greene, regarding the "final process" discussed at the briefing session, addressed President Higgins: "Once and for all, can we just go through the memo that you have provided and say that we're moving on." CP at 82. President Higgins, after granting that Mr. Eugster was "correct" because the memo was incorrect, then reiterated the amended process and concluded by saying, "that's the process that we agreed to this afternoon." CP at 82.

Fourth, Mr. Eugster points to Council member Holmes's exchange of e-mail while on vacation. The *Wood* court held that the strong public policy and mandate for liberal construction dictated a broad definition of "meeting" that encompassed discussions via e-mail. *Wood*, 107 Wn. App. at 564. The *Wood* court differentiated between the passive receipt of information by e-mail, and the active discussion of issues by exchanging e-mails. *Id.* Under *Wood*, the OPMA does not require the contemporaneous physical presence of the Council members in order to constitute a meeting. *Id.* at 562-63. Council member Holmes explained by affidavit that while out of the country e-mail was sent to her from an administrative assistant regarding scheduling of interviews and that she merely replied the next day that the schedules were "fine with me." CP at 102. Even so, under the *Wood* standards and the circumstances here, we cannot say further inquiry is unwarranted.

## 2. Action

Defendants next argue a "meeting" did not occur because no "action" took place. "Action" is defined as "the transaction of the official business of a public agency by a governing body including but not limited to receipt of public testimony, deliberations, discussions, considerations, reviews, evaluations, and final actions." RCW 42.30.020(3). " 'Final action' means a collective positive or negative decision, or

an actual vote by a majority of the members of a governing body when sitting as a body or entity, upon a motion, proposal, resolution, order, or ordinance." *Id.* Stressing the conjunctive "and" before "final action" the trial court interpreted the definition of an action to require a final action. "There has to be also 'and final action.' . . . It is only when deliberations, discussions, et cetera, are combined with final action that a violation can be found to have occurred." CP at 227. We disagree with this interpretation.

▮▮▮ The clear language of the statute defines action as "the transaction of the official business of a public agency by a governing body." RCW 42.30.020(3). The statute then goes on to give a nonexclusive list of examples, including final action. Action does not require final action. In addition to final actions, the list of examples includes discussions, deliberations, consideration, and review. The governing body members need merely "communicate about issues that may or will come before the Board for a vote." *Wood,* 107 Wn. App. at 565. The trial court's interpretation is overly narrow, not liberal. The case law is more inclusive.

In *Organization to Preserve Agricultural Lands v. Adams County,* 128 Wn.2d 869, 883 n.2, 913 P.2d 793 (1996), the court noted the plain language of the OPMA does not distinguish between action and discussions short of action because the definition of "action" includes "discussion." In *Miller v. City of Tacoma,* 138 Wn.2d 318, 326-27, 979 P.2d 429 (1999), the court also rejected an argument that action requires final action. Instead, the court held that all actions, including final actions, must be done in a meeting open to the public. *Id.*

▮▮▮ Moreover, a "final action" does not always require a formal vote, but also encompasses a collective positive or negative decision. RCW 42.30.020(3); *Miller,* 138 Wn.2d at 330. Thus, a consensus on a position to be voted on at a later council meeting would qualify as a collective position and a "final action." *Id.* at 330-31. Thus, had a "meeting" occurred an "action" would have occurred.

### 3. Knowledge

The final element in an OPMA penalties claim requires evidence supporting an inference the members knew they were meeting in violation of the OPMA. *Wood*, 107 Wn. App. at 566. In *Wood*, some school board members had stated concerns that using e-mail may violate the OPMA. This evidence was sufficient to create a material fact issue as to whether the school board members had actual or constructive knowledge they were meeting in violation of the OPMA. *Id.* at 566-67. While Mr. Eugster clearly voiced his concerns to the Council about his perception of OPMA problems in January, no earlier evidence similar to the type found in *Wood* is present in this record. On this last point, we must reject Mr. Eugster's speculative argument that somehow the Council's decision to ignore his OPMA objections in January evidences prior knowledge.

■■ ■ On the other hand, President Higgins's announcement that he reached a resolution with the majority, and that the majority was "adopting" the Procedure, provides inferences that at some point before January 8 he gathered a collective position on an issue from a majority of Council members. As to President Higgins, these declarations indicate knowledge of an agreement likely reached in violation of the OPMA, but it does not necessarily follow that each of the Council members polled would know that he or she was acting in concert with the others. These issues are best left for fact finding.

If indeed a majority did reach an agreement outside the OPMA boundaries, it would make no difference whether that agreement did or did not, in its initial form, violate other OPMA provisions proscribing agreements at executive sessions. Thus, it is not decisive that the Procedure was later corrected in the amended process and in the final resolution.

■■ Additionally, while the knowledge element is required to impose the civil penalty, it is not a necessary element for recovering attorney fees. *Miller*, 138 Wn.2d at

331-32. If an improper meeting took place, even without the Council members' knowledge that the meeting violated the OPMA, then attorney fees are provided by the Act. RCW 42.30.120(2). While the trial court was correct in reasoning the OPMA violation set forth in the January 5 Memo was mooted when the Procedure and the amended process were superceded by Resolution 01-05, it remains an open question whether Mr. Eugster's actions come within the attorney fee provisions of the OPMA.

However, if at fact finding no improper meeting is found, Mr. Eugster is not entitled to attorney fees or a civil penalty under the OPMA. This is so even if President Higgins's announcement on January 8 may have violated Council procedural rules and possibly RCW 35.22.288 (requiring a city to give public notice of its preliminary agenda for upcoming meetings). As noted, the focus is whether an improper meeting took place, not if the Procedure would have violated the OPMA had it not been abandoned and superseded before Mr. Eugster filed his lawsuit.

### 4. Attorney Fees

Under this record, we believe it can reasonably be inferred that Mr. Eugster's actions at the Council meeting prevented what seems conceded, that the Procedure without correction would have violated the OPMA. Taking President Higgins's statements in a light most favorable to Mr. Eugster, it can be said, considering the January 5 Memo and the timing and sequence of events, that by virtue of Mr. Eugster's stubbornness, the offending part of the Procedure was abandoned at the Council meeting. The Procedure was corrected in the amended process at the Council meeting, which in turn evolved into Resolution 01-05, which was finally passed after Mr. Eugster's suit, but before the show cause hearing.

In sum, Mr. Eugster may become a prevailing party if, on remand, the trial court finds a proscribed meeting. The trial court correctly concluded that Resolution 01-05 mooted

certain issues. However, the final decision regarding attorney fees, if any, for the proceedings below and here depend upon resolving competing factual inferences regarding whether a proscribed meeting took place within the meaning of the OPMA. Because fact finding is not a matter within the province of an appellate court, on remand the trial court may conduct such proceedings as it deems appropriate to resolve the factual dispute.

In remanding, we recognize Mr. Eugster is an attorney, a private party and citizen, and a Council member with public duties and responsibilities. These interrelated identities have been argued to us as bearing on an award of attorney fees. These arguments are best left to the trial court to resolve after fact-finding. Mr. Eugster may be viewed as having fostered OPMA principles through his actions, but this conclusion must be established after fact finding. If Mr. Eugster prevails on remand in fostering OPMA principles, the trial court has discretion in deciding the nature and extent of attorney fees required under the Act.

## B. Equitable and Declaratory Relief

The issue is whether the trial court erred by deciding the equitable and declaratory relief claims were moot. The trial court correctly exercised discretion when denying injunctive and declaratory relief. The trial court decided no continuing justiciable controversy existed on February 13, thus no clear need existed for injunctive or declaratory relief.

First, President Higgins, and to any relevant extent, individual Council members, abandoned the Procedure on January 8 by conceding it needed correction. Second, the amended process was substituted. Third, the amended process was subsumed in Resolution 01-05 on February 5.

Resolution 01-05, adopted on February 5, is concededly valid. *See Henry v. Town of Oakville*, 30 Wn. App. 240, 246, 633 P.2d 892 (1981) (later properly ratified

ordinance remedied procedural defect under OPMA); *Dioxin / Organochlorine Ctr. v. Pollution Control Hearings Bd.*, 131 Wn.2d 345, 350, 932 P.2d 158 (1997) (a matter is technically moot if the court cannot provide the basic relief sought). No evidence indicates the Council intends to use the Procedure in the future. *See Dunner v. McLaughlin*, 100 Wn.2d 832, 838, 676 P.2d 444 (1984) (issue moot if no need for future guidance and the issue will not likely reoccur).

## C. Attorney Disqualification

The issue is whether the trial court erred by failing to disqualify the city attorney's office from jointly representing the city, the Council, and fewer than all Council members in a lawsuit with another council member who has identified himself in the complaint as "Plaintiff," as well as "a member of the Spokane City Council, and a citizen, voter and taxpayer of the City of Spokane." CP at 4.

Whether an attorney's conduct violates the Rules of Professional Conduct (RPC) is a question of law we review de novo. *See Gustafson v. City of Seattle*, 87 Wn. App. 298, 302, 941 P.2d 701 (1997). RPC 1.7(a) prohibits a lawyer from representing a client if the representation of that client will be directly adverse to another client unless the lawyer reasonably believes the representation will not adversely affect the relationship with the other client, and both clients provide written consent after consultation and full disclosure. Subsection (b) likewise prohibits joint representation if the representation will be materially limited by the lawyer's responsibilities to another client, unless again, the lawyer reasonably believes the representation will not be adversely affected and both clients consent in writing after consultation and full disclosure.

Mr. Eugster argues the opposing counsel's representation of both the city and the individual Council members violates RPC 1.7(a) and (b). Initially, he contends the city attorney cannot pick sides by representing some Council members against another Council member. While a theo-

retical problem, the issue is moot because the city attorney withdrew. *See Dioxin/Organochlorine Ctr.*, 131 Wn.2d at 350.

Mr. Eugster contends the conflict continues even with substitute counsel because the city's interest in an open and public form of government is directly adverse to the individual Council members who improperly met. This argument presupposes a likelihood of continuing OPMA violations. Mr. Eugster fails to show evidence that the individual Council members have a pattern of holding improper meetings or a continuing interest in conducting future meetings offending the OPMA. On the other hand, the record shows prompt, if constrained, corrective action when a likely OPMA violation was pointed out.

 Further, the OPMA provides that members found to have violated the Act are subject to personal liability in the form of a civil remedy. RCW 42.30.120(1). Presumably, the city would not indemnify a Council member if a personal civil penalty would be imposed. Thus, Mr. Eugster is unpersuasive when arguing any financial conflict existed. *See In re Petition for Review of Opinion 552 of Advisory Comm'n on Prof'l Ethics*, 102 N.J. 194, 507 A.2d 233, 238 (1986) (actual conflict arises when government entity refuses to indemnify its co-defendant agent).

Even still, these issues are not frivolous. The comments to the *American Bar Association's Annotated Model Rules of Professional Conduct* 1.7 (1983) note, "[w]here the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question." In sum, the trial court did not err in denying Mr. Eugster's motion to disqualify Defendants' counsel or substitute counsel, but Mr. Eugster properly raised the question.

## D. CR 11

The issue is whether the trial court erred by abusing its discretion when denying CR 11 sanctions to Mr. Eugster.

Mr. Eugster argues the trial court erred in denying his motion for CR 11 sanctions against Defendants' attorney, Mr. Williams. Mr. Eugster contends sanctions are appropriate because Mr. Williams's motion for CR 11 sanctions against Mr. Eugster was not justified, and interposed to harass and frighten Mr. Eugster. The city did not cross-appeal the denial of its CR 11 motion.

CR 11 partly provides:

> Every pleading, motion and legal memorandum of a party represented by an attorney shall be dated and signed by at least one attorney of record in the attorney's individual name . . . . The signature of a party or of an attorney constitutes a certificate by the party or attorney that the party or attorney has read the pleading, motion, or legal memorandum; that to the best of the party's or attorney's knowledge, information, and belief, formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose . . . .

The decision to grant CR 11 sanctions is left to the sound discretion of the trial court and will not be overturned absent abuse of that discretion. *Harrington v. Pailthorp*, 67 Wn. App. 901, 910, 841 P.2d 1258 (1992). The abuse of discretion standard recognizes that deference is owed to the trial judge who is better positioned than an appellate court to decide the issue. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993). A trial court does not abuse its discretion unless its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). "The purpose behind CR 11 is to deter baseless filings and to curb abuses of the judicial system." *Bryant v. Joseph Tree, Inc.*, 119 Wn.2d 210, 219, 829 P.2d 1099 (1992) (emphasis omitted). The rule allows sanctions against anyone who signs a document that is either not well grounded in fact or warranted by law, or interposed for an improper purpose. *Id.* at 219-20.

As the moving party, Mr. Eugster has the burden to justify the request for sanctions. *Biggs v. Vail*, 124 Wn.2d 193, 202, 876 P.2d 448 (1994). He argues the Defendants' CR 11 motion was not well grounded in fact or law. Mr. Eugster must show the motion was both baseless and signed without reasonable inquiry. *Hicks v. Edwards*, 75 Wn. App. 156, 163, 876 P.2d 953 (1994). Mr. Eugster does not contend the Defendants' motion was signed without reasonable inquiry. The trial court found that Defendants' motion for CR 11 sanctions was not interposed to frighten and harass Mr. Eugster. Although Mr. Eugster disagrees, the record sufficiently supports the finding. While the record shows heated advocacy by both Mr. Eugster and Mr. Williams, this alone does not evidence Defendants' motion for CR 11 was interposed to frighten or harass Mr. Eugster.

## CONCLUSION

The trial court did not err when dismissing Mr. Eugster's claims for equitable relief, as they were no longer in issue by the time of the hearing. Nor did the trial court abuse its discretion when refusing to disqualify the substitute counsel, or when denying CR 11 sanctions. However, considering the strong public policy statement and goals underlying the OPMA, our mandate to liberally construe its provisions, and our conclusion that the evidence raises material issues of fact as to whether a proscribed meeting took place, we reverse the trial court's dismissal of the alleged OPMA violation claims and remand for proceedings consistent with this opinion, to include such proceedings as may be necessary to fix Mr. Eugster's attorney fees.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

SWEENEY and SCHULTHEIS, JJ., concur.

Reconsideration denied March 18, 2002.

Review denied at 147 Wn.2d 1021 (2002).